UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAC PRODUCTS, INC.*,*

Plaintiff,

v.

Case No.: 2:25-cv-12455
Hon. Gershwin A. Drain

REF ALABAMA, INC.,

Defendant.

_____/

## ORDER DENYING DEFENDANT REF ALABAMA, INC.'S MOTION FOR SANCTIONS [ECF No. 12]

Presently before the Court is Defendant REF Alabama, Inc.'s Motion for Sanctions. Defendant alleges that Plaintiff JAC Products, Inc. made false statements in its verified complaint, which led to the Court's issuance of a temporary restraining order against Defendant that required Defendant to return Plaintiff's inventory and supply its parts. Defendant seeks sanctions in the form of attorney's fees it incurred in responding to the action.[1] The Court concludes that a hearing will not aid in the

---

[1] Defendant originally requested sanctions in the form of attorney's fees, *and* sanctions equal to the value of the parts that Defendant was enjoined to supply to Plaintiff, because Plaintiff had yet to pay for them. ECF No. 12, PageID.220. Later, Defendant withdrew its request for payment for the parts because Plaintiff issued a payment for them. ECF No. 14, PageID.295. Defendant noted that it believes Plaintiff failed to pay the entire amount owed, and therefore Defendant "reserves all rights and claims regarding the amount paid by JAC and other outstanding amounts owed, including interest." *Id.* at PageID.295 n.2. Accordingly, Defendant is free to pursue any other remedy available to it with respect to Plaintiff's payments.

1

disposition of this motion and will determine the outcome on the briefs. E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, Defendant's Motion for Sanctions [ECF No. 12] is DENIED.

## I.     BACKGROUND

On August 7, 2025, Plaintiff JAC Products, Inc. filed the instant action via verified complaint against Defendant REF Alabama, Inc. *See* ECF No. 1.[2] Plaintiff is a tier-one automotive supplier that designs, manufactures, and distributes vehicle trim parts to original equipment manufacturers ("OEMs") and after-market distributors. *Id.* at PageID.3. Plaintiff had a Supply Agreement with Defendant whereby Plaintiff delivered some of its inventory to Defendant, Defendant drilled holes into the parts Plaintiff delivered, and Defendant returned the finished parts back to Plaintiff. *Id.* at PageID.3–4.

The Supply Agreement was a requirements contract that consisted of the parties' Purchase Order and Plaintiff's Terms and Conditions, which the parties executed on October 4, 2017. *Id.* at PageID.4; ECF No. 1-2 at PageID.24. Under the terms of the Purchase Order, the duration of the Purchase Order continued for the life of the applicable OEM vehicle program for which the product covered by the Purchase Order was supplied. Defendant agreed to supply Plaintiff, and Plaintiff

---

[2] REF Alabama, Inc. was purchased by Connector Manufacturing Corporation, which is REF's successor in interest. ECF No. 12, PageID.198 n.1.

agreed to purchase from Defendant, 100% of Plaintiff's requirements for the product covered by the Purchase Order. ECF No. 1-2, PageID.24. The Purchase Order at issue was for Part 24836R at a price of 0.3050 per part. *Id.* Under the Terms and Conditions, which were incorporated into the Purchase Order by reference, Defendant was not permitted to make changes to the Purchase Order without express prior written approval by Plaintiff. ECF No. 1-1, PageID.15–16. Moreover, the terms and conditions stated that Plaintiff "shall not be invoiced at a price higher than that stated in [the] Purchase Order," and "[n]o surcharges, premiums or other additional charges of any kind may be imposed upon [Plaintiff] unless expressly agreed to in writing by [Plaintiff]." *Id.* at PageID.14. Defendant agreed that "money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of [the] Purchase Order by [Defendant] with respect to its delivery of Products or Services to [Plaintiff] and that… [Plaintiff] shall be entitled to specific performance and temporary, preliminary and permanent injunctive or other equitable relief as a remedy for any such breach[.]" *Id.* at PageID.20.

According to Plaintiff's complaint, on August 6, 2025, Defendant orally threatened Plaintiff "with only a single day notice" that it would not return its inventory or supply the completed parts unless Plaintiff agreed to a future price increase and a retroactive price increase. ECF No. 1, PageID.6. Plaintiff further alleged that without the parts, Plaintiff would be forced to shut down its own

3

production as of August 7, 2025, which would cause Plaintiff to fail to meet its obligations to Subaru (the OEM). *Id.* at PageID.7. Aside from affecting Plaintiff and Subaru, Plaintiff also claimed that Plaintiff's shutdown would affect other parts suppliers whose parts or components go into the affected vehicle lines. *Id.* at PageID.8. Plaintiff alleged that it would take at least two weeks to find a replacement supplier and that the financial losses would be incalculable. *Id.*

Simultaneously, Plaintiff filed an emergency Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction, requiring Defendant to perform its obligations under the Supply Agreement at the prices set forth in the Purchase Order and show cause why a preliminary injunction should not issue. *See* ECF No. 2. The Court initially denied the motion without prejudice due to Plaintiff's failure to strictly follow the procedural requirements for TROs. *See* ECF No. 4. After Plaintiff re-filed the motion with corrections, the Court granted the TRO and ordered Defendant to supply the parts to Plaintiff according to the releases and at the prices set forth in the Purchase Order, including returning Plaintiff's inventory. *See* ECF No. 6. The Court also set a briefing schedule and a hearing on the Motion for Preliminary Injunction.

Defendant filed a response to the Motion for Preliminary Injunction. *See* ECF No. 10. Five days later, prior to its reply or the hearing on the preliminary injunction, Plaintiff filed a Notice of Voluntary Dismissal. ECF No. 11.

After the case was dismissed, Defendant filed a Motion for Sanctions pursuant to the Court's inherent authority, which is currently before the Court. Defendant alleges that Plaintiff made false statements in its verified complaint and Motion for TRO. According to Defendant, Defendant and Plaintiff entered into discussions "regarding the future of the relationship" in 2024. ECF No. 12, PageID.209. Defendant demanded a price increase, and the parties began negotiating. *Id.* at PageID.209–10. After some back and forth, Eduardo Cano, the Director of Purchasing at JAC Products, proposed a 60% increase with 50% implemented immediately and 50% implemented in January 2025. ECF No. 10-4, PageID.145. He indicated that the Board needed to approve the price increase. *Id.* In another email chain, Mr. Cano indicated that Plaintiff and Defendant needed to change the Purchase Orders in their systems to reflect these prices. ECF No. 10-13, PageID.192.

Meanwhile, Plaintiff continued submitting orders for parts from Defendant but did not pay the new prices. ECF No. 10, PageID.117–18. Rather, Plaintiff continued paying the original price of $0.3050 per part. ECF No. 10-9. The parties held a Microsoft Teams meeting on July 8, 2025 to discuss pricing once more. After the meeting, Mr. Cano circulated a screenshot of the chat, in which the parties attending the meeting (including Mr. Cano and another representative of Plaintiff) expressed acknowledgement of the following details: that each part is $0.5180; a new Purchase Order is to state the updated price; there are $155,000 in back

5

payments owed; and after 30 days, Plaintiff's account will go "on hold." ECF No. 10-10, PageID.183. However, the message further stated that a "resolution" and "proposal" were "expected" within 30 days. *Id.* A few days later, Plaintiff issued a new Purchase Order reflecting the new price of $0.5180. ECF No. 10-11. Plaintiff submitted its last order to Defendant on July 15, 2025. ECF No. 10-14, PageID.195.

This factual background was not included in Plaintiff's Motion for Temporary Restraining Order. Given the parties' diverging factual accounts, Defendant alleges that Plaintiff made the following materially false statements in its verified complaint:

1. That Defendant orally threatened Plaintiff with "only a single day notice" that it would not return its inventory or supply. ECF No. 12, PageID.215. Instead, the parties had been discussing this issue for some time, and Mr. Cano himself acknowledged and agreed that Plaintiff's account would "go back on hold"—i.e., Defendant would stop shipments and hold Plaintiff's inventory—without a resolution within 30 days. ECF No. 10-10, PageID.183.

2. That Plaintiff would be forced to shut down after August 7, 2025, causing irreparable harm. Even though the Court granted the injunction on August 11, 2025, Plaintiff took until August 14, 2025 to pick up the parts from Defendant, which belies the urgency of the relief requested. ECF No. 12, PageID.216.

3. That Plaintiff would suffer irreparable harm throughout the pendency of the case unless Defendant was preliminarily enjoined. Defendant points out that Plaintiff had stopped ordering parts from Defendant on July 15, 2025 and that Plaintiff moved on to another drilling supplier, meaning that a preliminary injunction was never necessary. *Id.*

4. That Plaintiff and Defendant's relationship was governed by the 2017 Purchase Order with a fixed price of $0.3050. This omitted months of negotiations and agreements with terms different than those represented in the 2017 Purchase Order. *Id.*

Plaintiff sees things differently. Plaintiff believes that Defendant had no right to unilaterally demand a price increase and that the 2017 Purchase Order still governed the parties' relationship. ECF No. 13, PageID.250. Plaintiff states that it had "no obligation to succumb" to Defendant's price demands, but attempted to negotiate while also looking for other sources of supply beginning in May 2025. *Id.* at PageID.251. Plaintiff claims that the July 2025 meeting between the parties was merely an interim agreement whereby Plaintiff agreed to an immediate go-forward price of $0.5180 per part, and agreed to keep negotiating for the next 30 days regarding back pay. *Id.* Plaintiff disputes Defendant's characterization that it agreed that Defendant could hold its inventory "hostage" after the 30 days was completed.

*Id.* Plaintiff also claims that it made a proposal to Defendant about the back pay issue within the 30 day timeframe, but Defendant rejected it. *Id.* at PageID.251–52.

Plaintiff notes that after the Court granted its TRO, it immediately emailed Defendant's representatives advising them that the injunction had been granted and requesting that they ship the parts. *Id.* at PageID.252. The following morning Plaintiff followed up again. Defendant responded, requesting that Plaintiff pick up the parts from Defendant's plant in the normal course. *Id.* at PageID.253. Plaintiff picked up the parts on August 14, 2025 and they arrived at Plaintiff's plant in Saline, Michigan on August 15, 2025. *Id.* at PageID.253–54. In the meantime, Plaintiff was successful in obtaining another supplier for drilling. Having obtained its parts from Defendant and having secured another supplier, it decided to dismiss the lawsuit voluntarily. *Id.* at PageID.254.

## II.    LEGAL STANDARD

"The district court has the 'inherent authority to award fees when a party litigates 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512 (6th Cir. 2002) (quoting *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997)). In other words, a court may impose sanctions under its inherent authority when it finds conduct to be "in bad faith" or "tantamount to bad faith." *Id.* at 517 (citations omitted).

This standard is met, for example, where the moving party shows that the nonmoving party engaged in fraud on the court, improper use of the court, harassment, delay, or disruption of litigation. *United States ex rel. Tingley v. PNC Fin. Servs. Grp., Inc.*, 705 F. App'x 342, 345 (6th Cir. 2017) (citing *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 753–54 (6th Cir. 2010)). At bottom, although the "bad faith" standard is not well defined in case law, "any test of bad faith requires a showing of some misconduct." *Jaiyeola v. Toyota Motor N. Am., Inc.*, No. 21-2737, 2022 WL 18401018, at *3 (6th Cir. Oct. 7, 2022). Notably, the Court should exercise its inherent powers "with restraint and discretion" and should only award sanctions when "the conduct of a party or an attorney is egregious[.]" *First Bank of Marietta*, 307 F.3d at 516.[3]

The parties disagree whether the three-part test for assessing attorney's fees is applicable in this case. Courts generally apply a three-part test when imposing attorney's fees as sanctions under their inherent authority. *See Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011). That test requires the court to find that the plaintiff's (1) claims advanced were meritless, (2) counsel knew or should have

---

[3] Regarding the burden of proof necessary to impose sanctions under a court's inherent authority, "[c]ourts disagree about the proper standard of proof necessary to impose sanctions—preponderance of the evidence or clear and convincing evidence." *In re Jones*, 632 B.R. 138, 150 n.6 (Bankr. S.D. Ohio 2021) (collecting cases). The Court need not resolve this question because the Court finds that even if the lower standard applies, Defendant has not met its burden of demonstrating that Plaintiff litigated in bad faith or tantamount to bad faith.

known this, and (3) the motive for filing the suit was for an improper purpose. *Id.* Defendant argues that the test is inapplicable because Defendant seeks sanctions against Plaintiff as a party, not Plaintiff's counsel. ECF No. 12, PageID.214 n.2. On the other hand, Plaintiff argues that the three-part test is implicit even in cases where sanctions are sought against a party. ECF No. 13, PageID.259.

The three-part test does not apply here, but not for the reason Defendant argues. In *Williamson v. Recovery Limited Partnership*, the Sixth Circuit held that the test "clearly contemplates a situation in which a plaintiff has filed a frivolous *lawsuit*," as opposed to mere "misconduct in litigation." 826 F.3d 297, 302 (6th Cir. 2016) (emphasis added). Here, Defendant makes clear that its motion is not predicated on the merits of the lawsuit, but rather, on the alleged misrepresentations in Plaintiff's request for a TRO. *See* ECF No. 14, PageID.289. Accordingly, the question before the Court is (1) whether Plaintiff engaged in the conduct Defendant alleges, and (2) whether Plaintiff had bad faith in doing so. *See Williamson*, 826 F.3d at 302; *see also Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc.*, No. 16-cv-13456, 2018 WL 5098784, at *7 (E.D. Mich. Oct. 19, 2018) ("*Williamson…* provides guiding precedent here because there, as here, the issue was not whether plaintiff 'filed a frivolous lawsuit' but rather whether sanctions were appropriate for a party's… contumacious conduct.").

### III.   DISCUSSION

Upon considering the parties' arguments, the Court concludes that it must exercise "restraint and discretion" here and deny Defendant's request for sanctions, as Defendant has not demonstrated that Plaintiff made false statements or that its conduct was egregious, in bad faith, or tantamount to bad faith. *Doe v. Univ. of Mich.*, No. 18-11776, 2020 WL 9259701, at *2 (E.D. Mich. Nov. 25, 2020).

Defendant's first argument is that Plaintiff lied when it claimed that Defendant gave only one day's notice that it would not return Plaintiff's inventory or deliver its completed parts. ECF No. 12, PageID.215. Defendant rests this argument on the Microsoft Teams messages where the parties acknowledged that Plaintiff's account would go "on hold" after 30 days. ECF No. 10-10, PageID.183. According to Defendant, this "agreement" made Plaintiff aware that Defendant would retain all completed parts and Plaintiff's inventory.

But the Microsoft Teams messages do not state that going "on hold" meant that Defendant would not deliver parts it already completed or that Defendant would hold onto Plaintiff's inventory. The messages do not define what "on hold" means. Rather, the messages are ambiguous, and indeed, seem to suggest that the parties had not reached a final agreement at all and that some sort of "resolution" was expected at a later date. *Id.* Defendant does not explain why the Teams message should be construed as Plaintiff's agreement that the completed parts and inventory

would be held by Defendant after 30 days. In sum, Plaintiff's claim that it only had one day of notice is consistent with the evidence. Thus, Defendant has presented no evidence that Plaintiff's assertion was false or that it was made in bad faith or in a manner tantamount to bad faith.

Defendant's second argument is that Plaintiff lied when it alleged that its production would shut down on August 7, 2025. Defendant's argument is predicated on the fact that it took Plaintiff three days after the entry of the TRO on August 11, 2025 to pick up the parts from Defendant's warehouse. ECF No. 12, PageID.216. But as Plaintiff makes clear, it reached out to Defendant within an hour of the entry of the TRO to try to coordinate delivery. The next day, Defendant insisted that the parts be picked up from its plant. As such, Plaintiff coordinated pickup, which it accomplished on August 14, 2025. ECF No. 13, PageID.262. The Court cannot assume that Plaintiff did not need the parts simply because Plaintiff took until August 14 to pick them up. The Court does not know what logistical efforts were required to coordinate the pickup. There is no evidence that it was even physically possible for Plaintiff to pick the parts up any sooner. Most importantly, there is also no evidence that Plaintiff's operations were not critically impacted during this timeframe. Accordingly, Defendant has not presented evidence that Plaintiff's allegations were false or misleading or that Plaintiff's conduct was in bad faith or tantamount to bad faith.

Defendant's third argument is that Plaintiff lied when it alleged that it relied on Defendant's drilling service through the life of the OEM program. Defendant notes that Plaintiff stopped ordering parts from Defendant on July 15, 2025 and that Plaintiff ultimately moved on to another drilling supplier, so a preliminary injunction would never have been necessary. ECF No. 12, PageID.216. But Plaintiff never claimed that it needed Defendant's services throughout the life of the OEM program. Rather, Plaintiff claimed that Defendant was holding its inventory and completed parts, that this would cause a cascading disruption to the automotive supply chain, and that it would take Plaintiff at least two weeks to find a replacement source of drilling. ECF No. 1, PageID.8. Defendant has not shown that any of these claims were untrue.

Moreover, the Court does not know when Plaintiff's next order of parts would have been due, so the Court cannot assume bad faith in fact that Plaintiff's last order was made on July 15, 2025. Indeed, as is obvious from the facts of the case, Defendant was still working on parts from Plaintiff's last order. Nor can the Court assume bad faith in the fact that Plaintiff ultimately re-sourced its drilling from another supplier. At the time Plaintiff filed the suit and the Motion for Temporary Restraining Order, Plaintiff had not yet re-sourced the needed drilling. ECF No. 13, PageID.263. In other words, Defendant's assertion that Plaintiff "never intended to pursue" a preliminary injunction is not supported by evidence, because Plaintiff

13

could very well have needed a preliminary injunction if it had failed to source another drilling supplier. Defendant has not demonstrated that Plaintiff made a false statement in this regard, or that Plaintiff's assertions were in bad faith or tantamount to bad faith.

Defendant's last argument is that Plaintiff lied that the parties' relationship was governed by the 2017 Purchase Order, omitting "months of negotiations and multiple written agreements" with terms different than those in the 2017 Purchase Order. ECF No. 12, PageID.217. Specifically, Defendant alleges that in October 2024, Plaintiff agreed to new terms and prices in a series of emails. *Id.* But those emails expressly indicated that the "agreed" prices were proposals that still required approval from management or Plaintiff's Board. ECF No. 10-4, PageID.145, 148. There is no evidence that the required approvals were ever obtained. In addition, Defendant alleges that Plaintiff agreed in the Microsoft Teams meeting that Defendant could put its account "on hold" if a resolution between the parties was not reached in 30 days. ECF No. 12, PageID.217. As already discussed, however, that purported "agreement" is unclear—it could easily be interpreted as a simple agreement to continue negotiations—and certainly does not specifically indicate Plaintiff's consent to withholding Plaintiff's inventory and completed parts. Finally, Defendant alleges that after the Microsoft Teams meeting in July 2025, Plaintiff issued a new Purchase Order which reflected the new price of $0.5180 per part. ECF

14

No. 14, PageID.294. But that Purchase Order says nothing about the price retroactively applying to previous transactions or owing back pay. Therefore, Defendant has not shown that Plaintiff made false statements or that Plaintiff acted in bad faith or tantamount to bad faith.

In sum, none of the statements in Plaintiff's verified complaint were truly false. Its statements were consistent with the facts of the case, and it was not improper for Plaintiff to seek emergency injunctive relief on arguably meritorious grounds. *See Davis v. Detroit Downtown Dev. Auth.*, No. 17-cv-11742, 2018 WL 564235, at *5 (E.D. Mich. Jan. 26, 2018) ("Plaintiffs apparently believed that such financing was unlawful and were thus well within their rights to file arguably meritorious claims to attempt to prevent it.").

To be sure, Plaintiff could have provided more detail in its Motion for TRO. As discussed above, however, the lack of detail did not amount to falsehoods by omission, and the Court concludes it is not enough to show that Plaintiff was vexatious or had bad faith. "[N]egligent, even sloppy" conduct "is insufficient to award monetary sanctions under a court's inherent power." *Mich. Immigrant Rights Ctr. v. U.S. Dep't of Homeland Sec.*, No. 2:16-cv-14192, 2020 WL 5627088, at *3 (E.D. Mich. Sept. 21, 2020). Although Plaintiff could have (and arguably should have) been more thorough in presenting its argument in favor of the TRO, Plaintiff's conduct was not so egregious as to warrant the imposition of sanctions under the

15

Court's inherent authority. *See Tingley*, 705 F. App'x at 345 (quoting *First Bank of Marietta*, 307 F.3d at 516).

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Sanctions [ECF No. 12] is **DENIED**.

**SO ORDERED.**

Dated:  July 6, 2026                                         /s/Gershwin A. Drain
                                                            GERSHWIN A. DRAIN
                                                            United States District Judge